UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**CRUZ E. KERIN,**

**Plaintiff,**

-v-                                    **1:12-CV-100 (NAM/CFH)**

**SCHENECTADY ARC,**

**Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Office of Patrick Sorsby
Patrick Sorsby, Esq., of counsel
180 Colonial Avenue
Albany, New York 12208
Attorney for Plaintiff

Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C.
Michael J. Murphy, Esq., of counsel
20 Corporate Woods Boulevard
Albany, New York 12211-2362
Attorney for Defendant

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Defendant moves (Dkt. No. 49) for summary judgment dismissing the second amended

complaint (Dkt. No. 25) in this employment discrimination action based on 42 U.S.C. § 2000e-2,

*et seq.* ("Title VII") and New York State law.  As set forth below, the Court dismisses with

prejudice so much of the fifth cause of action as states a common-law claim for intentional

infliction of emotional distress and otherwise denies the motion.  Further, the Court proposes to

combine the second and third causes of action for purposes of trial.

**BACKGROUND**

The following background facts are undisputed unless otherwise indicated. Defendant operates residential facilities throughout Schenectady County, including a residential facility known as Pauley House. The residents of Pauley House, referred to as "consumers," are profoundly disabled men and women who need significant assistance with all activities of daily living. At all relevant times, Brian Mulqueen, the Program Manager for Pauley House, supervised all employees of that facility. Pauley House is staffed by Direct Support Professionals ("DSPs"), who are responsible to "assist, counsel and instruct program participants in all areas of daily living" and "implement and comply with Individualized Service Plans and document daily progress on all appropriate forms in each Service Plan Book." A DSP's duties include, but are not limited to, meeting the consumers' toileting, bathing, and dressing needs, preparing and serving food, and light cleaning. According to defendant, as part of their orientation, DSPs are trained to understand "the sexual rights of ... consumers and how to best provide for their safety and education." As relevant to this case, consumers have the right to engage in masturbation when alone in a private place, specifically a bathroom or bedroom.

On May 3, 2010, defendant hired plaintiff as an "Awake Overnight" DSP on a 90-day provisional basis. Among the residents of Pauley House during the time plaintiff worked there was a man (identified by his first initial "G") who is confined to a wheelchair and requires care for every aspect of daily living. G frequently masturbated, and his behavior plan makes specific reference to the behavior. This behavior had been known to cause him injury, and on May 5, 1999 G's doctor directed: "KY Jelly prn use as directed."

Defendant's Statement of Material Facts, based on certain record evidence, states: "On or

-2-

about June 4, 2010, plaintiff and Mr. Mulqueen came to be in the bathroom with G. G was

engaged in masturbation at this time. Mr. Mulqueen retrieved a tube of KY Jelly from G's

activities of daily living ... kit and demonstrated to plaintiff how KY Jelly should be provided to

G."

Plaintiff's response to defendant's Statement of Material Facts, supported by her

deposition testimony, includes the following:

> On June 4, 2010 [plaintiff] was in the Pauley house bathroom preparing for
> the bathing of G. At about this time Mulqueen awakened G and brought him
> into the bathroom. Mulqueen ordered G to lift himself from the chair and took
> his depends off exposing G's genitalia to the Plaintiff. At this time Mulqueen
> applied KY Jelly to the penis of G. In response G began to massage his penis
> with both hands and began to squeal. Mulqueen told [plaintiff] she had to put
> the KY Jelly on G's penis because it was prescribed by the doctor and he also
> told her that she had to make sure he climaxed. Mulqueen then walked out of
> the bathroom and closed the door. He came back approximately every 15
> minutes and would open the door to watch. This happened for 45 minutes.

According to plaintiff's deposition testimony, Mulqueen specifically directed her to remain in the

bathroom with G during this incident, and said he would come back every 15 minutes to check on

her. Plaintiff's Statement of Material Facts, based on her deposition testimony, further states:

> That on June 5th 2010 Mr. Mulqueen again applied KY Jelly to the penis of
> "G" with [plaintiff] in the bathroom and left her there with the door shut. That
> Mr. Mulqueen checked on [plaintiff] 15 minutes later asking how it was going
> and she stated that he was still masturbating at which Mr. Mulqueen stated he
> would check back in another 15 minutes. That Mr. Mulqueen checked back
> in 15 minutes and attempted to forcibly stop G from masturbating but was
> unable. At this point Mr. Mulqueen said he would give G another 15 minutes.
> When Mulqueen returned 15 minutes later he propped the door open and was
> watching "G" masturbate in front of [plaintiff]. At this time Mr. Mulqueens
> eyes were rolled in the back of his head and he was making a motion with his
> hand simulating masturbation.

Plaintiff testified at her deposition: "I was paralyzed of fear that this thing is turning into

something else, that he is having gratification of watching this gentleman for something that is

-3-

prescribed." According to plaintiff, she believed Mulqueen's actions constituted sexual harassment. Plaintiff testified that on June 7, 2010 she told Mulqueen that her moral and religious values prevented from doing what he told her to do, and that he "gave her a dirty look," stated, "What, you have moral standards? Bah!" and left the room.

Plaintiff states that on June 9, 2010 Mulqueen went on vacation and returned to work on June 14, 2010. On June 18, 2010, Mulqueen met with plaintiff and Bradley Deetz, a Program Manager at other residences, to discuss Mulqueen's concerns regarding plaintiff's performance. On June 22, 2010, Mulqueen authored a memo regarding the June 18, 2010 meeting, stating in part:

> During your time with us you have displayed compassion and a genuine caring nature towards coworkers and consumers. However, as we have discussed on several occasions, there are ongoing concerns regarding your initiative in completion of tasks, your attendance and dependability with work and required trainings and failure to communicate essential information.
>
> It is critical that you demonstrate dramatic improvement in these areas over the coming weeks. Failure to improve could result in disciplinary action up to and including termination.

Plaintiff reviewed and signed the memo and declined to respond in writing.

On July 1, 2010, Mulqueen met with plaintiff and Edith Fleig, defendant's Assistant Director. Fleig supervises five program managers, including Mulqueen. At the meeting, plaintiff admitted that she had not finished reading the "Blue Books," which contain case notes, individualized service plans, behavior support plans, clinician's reports, feeding guidelines, and dietary guidelines for each consumer, and which cover all aspects of a DSP's care and interaction with a consumer. G's Blue Book directs that if he masturbates outside the privacy of his room, he should be told to stop and then brought to his room so he can masturbate in privacy. It also

indicates that he may need KY Jelly to be applied.

On July 16, 2010, prior to the end of her 90-day provisional period, plaintiff attended a meeting with Mulqueen and Fleig, at which time plaintiff's employment was terminated. The letter terminating plaintiff, dated July 19, 2010, states: "This letter should serve as written documentation of the termination of your employment effective July 16, 2010. This action was necessary because you failed to meet the minimum job performance expectations during your 90 day provisional period."

Mulqueen issued a memo dated July 16, 2010 regarding plaintiff's termination. The memo states that plaintiff "was not able to follow direction, failed to attend required trainings/staff meetings, had difficulty accepting constructive criticism, and lacked the appropriate amount of initiative required to be a successful employee." The memo sets forth numerous bulleted items regarding specific issues, including her failure to read the consumers' Blue Books; her failure to make adequate entries in records; her failure to attend certain trainings the first time they were scheduled; her failure to master the time clock; her failure to handle food preparation properly; and communication problems. The memo concluded:

> The last and most concerning reason why we felt it was necessary to terminate [plaintiff] was because it takes too many repeated instructions before she can complete something accurately/completely. The consumers at Pauley House are vulnerable (profoundly disabled) individuals and she is working during the most vulnerable time (11 pm-7am). Will she respond quickly and accurately should an emergency occur? If her other performance is an indicator, the answer is no.

Plaintiff disputes Mulqueen's stated reasons for her termination. She contends, *inter alia*, that there was no deadline for completing the Blue Books; that she completed the Blue Books before she was terminated; that she missed trainings because Mulqueen made mistakes on the

schedule and gave her incorrect information; that other people, including Mulqueen himself, had problems using the time clock; and that she handled food preparation as she had been taught.

In her second amended complaint (Dkt. No. 26), plaintiff sets forth causes of action for *quid pro quo* sexual harassment (Title VII); hostile work environment (Title VII); retaliation (Title VII); intentional infliction of emotional distress (New York common law); and violation of New York State Human Rights Law (N.Y. Exec. Law § 296).

## DISCUSSION

**Standard on summary judgment**

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

**Title VII**

Title VII of the Civil Rights Act of 1964 provides:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of his employment, because of such individual's ... sex ...; or to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex.

42 U.S.C. § 2000e–2(a).

**First Cause of Action - *Quid Pro Quo* Sexual Harassment**

*Quid pro quo* harassment occurs when submission to or rejection of unwelcome sexual conduct by an employee is used as the basis for employment decisions affecting the employee. *See Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2nd Cir. 1994). Thus under a *quid pro quo* theory of discrimination, "[w]hen a plaintiff proves a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms or conditions of employment that is actionable under Title VII." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753-54 (1998). Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment - either actually or apparently - the law imposes strict liability on the employer for *quid pro quo* harassment. *Karibian*, 14 F.3d at 777.

To establish a *prima facie* case of *quid pro quo* gender discrimination, "a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Id*. at 777. Under the familiar *McDonnell Douglas* formulation, once a plaintiff has presented a *prima facie* case of discrimination, the employer may avoid liability by articulating some "legitimate, nondiscriminatory reason" for the adverse action taken against the employee. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back to the employee to show that the employer's stated reason is in fact a pretext for discrimination and that unlawful discrimination was the real reason for the adverse action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

In her second amended complaint, plaintiff claims that on June 4 and 5, 2010, "on the basis of her sex [she] was subjected to unwelcome verbal and physical conduct of a sexual nature ... and ... was terminated because she rejected this conduct" and that "Mulqueen's propounded reasons for [plaintiff's] termination were a pretext for his desire to terminate her for her refusal to endure verbal or physical conduct of a sexual nature." Plaintiff testified that, after the June 5, 2010 incident, she told Mulqueen that her religious and moral principles prevented her from "doing what he told her to do." She also submits evidence that thereafter, Mulqueen raised numerous complaints about her performance and ultimately influenced the termination decision. On this record, plaintiff has met her initial burden of presenting a *prima facie* case of *quid pro quo* discrimination. Further, defendant has met its burden of showing legitimate, nondiscriminatory reasons for plaintiff's discharge; Fleig, Fenton, and Mulqueen all testified regarding plaintiff's performance problems. Plaintiff has, however, introduced enough evidence to raise a question of fact on whether the reasons given for her discharge were pretextual. It is true that "a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's*, 509 U.S. at 515 (internal quotation marks and italics omitted). Here, plaintiff has introduced evidence that the reasons given for her termination were false. She has also introduced evidence that nearly all justifications given for her termination originated with Mulqueen, the alleged harasser; that most of his complaints about her performance arose after the alleged incidents of June 4 and 5, 2010; and that he "engineered" at least one of plaintiff's mistakes by giving her incorrect information. Moreover, the record shows that Mulqueen had a great deal of influence regarding plaintiff's termination. There is enough record evidence that her discharge occurred under circumstances

giving rise to an inference of discrimination to permit a reasonable jury to find for plaintiff on the issue of *quid pro quo* harassment.

**Second Cause of Action - Hostile Work Environment**

The Second Circuit has summarized the law applying to Title VII hostile work environment claims as follows:

> A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer. The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.

*Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002) (citations and quotation marks omitted); *accord Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013). In determining whether the threshold has been met, relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The plaintiff must also subjectively perceive the environment to be abusive. *Id*. at 22-23. Further, in order to establish a sex-based hostile work environment under Title VII, "a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374 (citation omitted). An employer is presumed responsible for the hostile work environment where the perpetrator of the harassment was a supervisor with immediate or successively higher authority over the employee. *See Burlington Indus.*, 524 U.S. at 765.

Defendant argues that, even accepting for purposes of this motion that Mulqueen ordered plaintiff to remain in the bathroom during both incidents, Mulqueen's alleged conduct is not objectively severe or pervasive such as to alter the terms and conditions of her employment. In its Memorandum of Law, defendant argues as follows:

> ... New York State regulations require that service providers such as ARC preserve the right of individuals "to express sexuality as limited by one's consensual ability to do so, provided such expressions do not infringe on the rights of others." 14 NYCRR § 633.4.
>
> In the instant case, consumer G, notwithstanding his limitations, had the right to engage in sexual behavior in an appropriate manner. Defendant's staff are trained to respond to consumer sexuality, and specifically those consumers who may wish to masturbate. G engaged in this type of behavior, and his behavior plan review and individual service plan make mention of it. Specifically, G had been known to cause injury to himself from masturbation. His doctor began directing the use of KY jelly on an as-needed basis.
>
> It is well established that G's use of KY Jelly was a well established part of his behavior and care plan and had been deemed medical[ly] necessary by G's physician. Plaintiff's claimed moral objections to this activity are simply not sufficient to warrant depriving G of proper care and dignity. Plaintiff was exposed to this activity on two (2) occasions.

(Citations to record omitted.)

This argument ignores plaintiff's testimony to the effect that on both occasions, Mulqueen engaged in inappropriate conduct of a sexual nature towards G, a disabled man in plaintiff's care; that Mulqueen forced plaintiff to observe that conduct; that Mulqueen unjustifiably required plaintiff to remain in the bathroom; and that Mulqueen engaged in this conduct for his own sexual gratification. Plaintiff's evidence is sufficient to support a finding that Mulqueen subjected plaintiff to conduct that was severe enough to create an objectively hostile or abusive work environment, and that plaintiff subjectively perceived it to be hostile. Assuming for this motion the truth of plaintiff's evidence and the reasonable inferences therefrom, under all the

-10-

circumstances a reasonable factfinder could conclude that Mulqueen subjected plaintiff to the incidents of June 4 and 5, 2010 because she was female.

Material issues of fact exist regarding whether plaintiff was subjected to a hostile work environment. The Court has considered defendant's arguments and finds that they do not warrant dismissal of plaintiff's hostile work environment claim.

## Third Cause of Action - Hostile Work Environment

The third cause of action also appears to be a hostile work environment claim. It alleges that Mulqueen "subjected plaintiff to unwelcome verbal and physical conduct of a sexual nature the submission of which was made explicitly and implicitly a term or condition of her ... employment" when he told plaintiff that "she must apply the KY Jelly to the G's penis because the doctor prescribed it and that she [must] remain in the bathroom until he climaxed from masturbating." Plaintiff's Memorandum of Law does not suggest that plaintiff intends to proceed on any federal cause of action other than *quid pro quo*, hostile work environment, and retaliation. For purposes of trial, to avoid juror confusion and the possibility of inconsistent verdicts, the Court believes that the second and third causes of action should be combined into one hostile work environment claim. Therefore, plaintiff is directed to show cause why the second and third causes of action should not be combined for trial.

## Fourth Cause of Action - Retaliation

As the Second Circuit explains:

> Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis. First, the plaintiff must establish a prima facie case. That is, an employee must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. The burden of proof that must be met to permit

a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as minimal and *de minimis*.

If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citations and quotation marks omitted). In this regard, a retaliation claim follows the burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802-05.

Plaintiff here has met her *de minimis* burden of establishing a *prima facie* case by showing that she engaged in a protected activity, that is, she objected to Mulqueen's allegedly harassing conduct; that Mulqueen knew of her objection; and that thereafter, Mulqueen raised numerous complaints about her performance and heavily influenced the termination decision. As already discussed in the context of plaintiff's *quid pro quo* claim, defendant has met its burden of showing legitimate, nondiscriminatory reasons for plaintiff's discharge, and plaintiff has introduced enough evidence to raise a question of fact on whether the reasons given for her discharge were pretextual. Plaintiff has adduced sufficient evidence to resist summary judgment on her retaliation claim.

**Fifth Cause of Action - State Law Claims**

Plaintiff has abandoned her claim for intentional infliction of emotional distress under New York common law by not opposing the summary judgment motion on this issue. In any event, the claim is time-barred by the one-year statute of limitations in N.Y.C.P.L.R. 215(3). *See Petterson v. Balsamico,* 440 F.3d 104, 112 n.4 (2d Cir. 2006). This claim is dismissed with

-12-

prejudice.

In the fifth cause of action, plaintiff also contends that defendant violated her rights under the New York State Human Rights Law, N.Y. Exec. Law § 296.  For purposes of this motion, plaintiff's Human Rights Law claims are analytically identical to claims brought under Title VII. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011). Therefore, summary judgment dismissing plaintiff's Human Rights Law claims is denied, and plaintiff may proceed on her Human Rights Law claims in tandem with her federal claims.

## CONCLUSION

It is therefore

ORDERED that defendant's motion (Dkt. No. 49) for summary judgment is granted to the extent of dismissing with prejudice that part of the fifth cause of action of the second amended complaint which asserts a common-law claim for intentional infliction of emotional distress, and the motion is otherwise denied; and it is further

ORDERED that, within 15 days of the date of this Memorandum-Decision and Order, plaintiff shall either (1) notify the Court that she consents to combining the second and third causes of action into a single cause of action for hostile work environment, or (2) show cause why the second and third causes of action should not be so combined by filing a memorandum of law not to exceed five pages, articulating the legal theory underlying the third cause of action and the basis for distinguishing it from the second cause of action; and if plaintiff files such a memorandum of law, defendant may, if it so desires, file a responding memorandum of law not to exceed five pages within 10 days thereafter; and it is further

ORDERED that plaintiff's failure to respond in accordance with the preceding paragraph

-13-

will be deemed to constitute consent to combining the second and third causes of action into a single cause of action for hostile work environment.

IT IS SO ORDERED.

Date:   September 24, 2014
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge